# United States Court of Appeals
## FOR THE EIGHTH CIRCUIT

_____

No. 98-2139

_____

Roger Pierce,                               *
                                            *
            Appellant,                      *
                                            *   Appeal from the United States
     v.                                     *   District Court for the
                                            *   Eastern District of Arkansas.
Kenneth S. Apfel, Commissioner,             *
Social Security Administration,             *
                                            *
            Appellee.                       *

_____

Submitted:  December 16, 1998

Filed: April 20, 1999

_____

Before FAGG, HEANEY, and WOLLMAN, Circuit Judges.

_____

WOLLMAN, Circuit Judge.

Roger Pierce appeals from the district court's[1] judgment affirming the denial of his application for social security disability benefits under Title II of the Social Security Act, 42 U.S.C. § 401 et seq.  For reversal, Pierce argues that the hypothetical

_____

[1]The Honorable Jerry Cavaneau, United States Magistrate Judge for the Eastern District of Arkansas, to whom the case was submitted by consent of the parties under 28 U.S.C. § 636(c).

question posed to the vocational expert failed to accurately describe his mental impairments. We affirm.

## I.

Pierce, who was born on September 16, 1942, was 49 years of age when he applied for benefits. He has a seventh-grade education. His past relevant work history includes work as a farmer and as a packer of shock absorbers. Pierce filed an application for disability insurance benefits on May 13, 1991, alleging a disability onset date of July 15, 1989. He claimed that he was disabled because of stress, anxiety, a nervous stomach, bodily aches, depression, and a right ankle metal plate and screw.

The Social Security Administration denied Pierce's application originally and again on reconsideration. Pierce appealed, and the district court reversed and remanded his case for further administrative proceedings. A supplemental hearing was held before an Administrative Law Judge (ALJ) on October 2, 1995, and on May 30, 1996, Pierce's application was again denied.

The ALJ evaluated Pierce's claim according to the five-step analysis prescribed by the Social Security Regulations. See 20 C.F.R. § 404.1520(a)-(f); see also Bowen v. Yuckert, 482 U.S. 137, 140-42 (1987) (describing the five-step process). The ALJ concluded that Pierce's impairments did not meet or equal an impairment listed in Appendix 1, Subpart P, Regulations No. 4. The ALJ also found that Pierce could not return to his past relevant work as a farmer or packer. After considering the response of a vocational expert to a hypothetical question, the ALJ found that Pierce was not disabled.

The Appeals Council denied Pierce's request for further review, and the ALJ's decision thereby became the final decision of the Commissioner. Pierce subsequently

appealed to the district court pursuant to 42 U.S.C. § 405(g).  The district court granted the Commissioner's motion for summary judgment, finding that substantial evidence supported the Commissioner's decision to deny Pierce disability benefits.

## II.

Our role on review is to determine whether the Commissioner's findings are supported by substantial evidence in the record as a whole.  See Clark v. Apfel, 141 F.3d 1253, 1255 (8th Cir. 1998).  Substantial evidence is relevant evidence which a reasonable mind would accept as adequate to support the Commissioner's conclusion.  See Woolf v. Shalala, 3 F.3d 1210, 1213 (8th Cir. 1993).  In determining whether the existing evidence is substantial, "we must consider evidence that detracts from the [Commissioner's] decision as well as evidence that supports it."  Id.  We may not reverse the Commissioner's decision merely because substantial evidence exists in the record that would have supported a contrary outcome.  See Smith v. Shalala, 987 F.2d 1371, 1374 (8th Cir. 1993).

The ALJ found that Pierce retained the ability to occasionally lift and carry up to 25 pounds; stand and walk for four hours in an eight-hour work period, one without interruption; and sit for six hours in an eight-hour work period, two without interruption.  Further, the ALJ concluded that Pierce could on occasion climb, balance, stoop, crouch, kneel, crawl, reach, handle, feel, and that he could push or pull with slight impairment.  The ALJ also found that Pierce had no impairment involving his ability to see, hear, or speak.  See Admin. Tr. at 278.  In evaluating Pierce's mental impairments, the ALJ concluded:

> He is likewise evaluated with good ability to follow work rules; relate to co-workers; deal with the public; use judgement; interact with supervisors; function independently; maintain attention/concentration; understand, remember, [and] carry out complex job instructions; maintain personal appearance; behave [in an] emotionally stable

manner; relate predictably in social situations; and good ability to demonstrate reliability.

Finally, the claimant is assessed with a fair ability to deal with stresses and a very good ability to understand, remember, carry out simple job instructions and understand, remember, and carry out detailed but not complex job instructions.

Admin. Tr. at 278.

The ALJ posed a hypothetical question to a vocational expert that recounted the foregoing findings regarding residual functional capacity. The vocational expert testified that a person with the described physical and mental limitations could perfom a variety of sedentary jobs, such as manufacturing, of which 20,000 were available.

"Testimony from a VE based on a properly-phrased hypothetical question constitutes substantial evidence." Roe v. Chater, 92 F.3d 672, 675 (8th Cir. 1996). A proper hypothetical question presents to the vocational expert a set of limitations that mirror those of the claimant. See id. at 676. "Questions posed to a vocational expert should precisely set out the claimant's particular physical and mental impairments." Totz v. Sullivan, 961 F.2d 727, 730 (8th Cir. 1992). Pierce contends that the hypothetical question posed to the vocational expert failed to state precisely the extent of his mental limitations. He asserts that the mental limitations outlined in the hypothetical question are inconsistent with the findings of Dr. Tom Heisler, the Commissioner's consulting psychologist, who noted on a medical assessment checklist that Pierce retained only a fair ability to function independently, to maintain attention and concentration, and to demonstrate reliability.[2] Pierce argues that the

[2]The Medical Assessment of Ability to do Work-Related Activities (Mental) provides the following definitions:

ALJ is bound by Dr. Heisler's findings. In <u>Bentley v. Shalala</u>, 52 F.3d 784, 786-87 (8th Cir. 1995), however, we stated that the government does not have to "live with" an expert's conclusions simply because the government hired the expert to evaluate the claimant. The ALJ may reject the conclusions of any medical expert, whether hired by the claimant or the government, if they are inconsistent with the record as a whole. <u>See</u> <u>id.</u> at 787.

We believe that the record as a whole supports the ALJ's findings regarding Pierce's mental limitations. Pierce's own testimony indicates that he considers himself to be independent and reliable. He testified that so long as he is not suffering from a headache, he is able to maintain attention and concentration. In response to a question whether he could stay at home alone for one or two weeks, Pierce responded, "there wouldn't have to be nobody to tell me what to do and what not to do." Pierce also testified that if told to be somewhere at a certain time, he would be there if he could find someone to drive him. In a word, Pierce's responses are indicative of a person who, if put to the test of performing responsibly in the workaday world, would be able to function at a capacity consistent with that attributed to him by the ALJ. Accordingly, we conclude that the hypothetical question posed by the ALJ accurately set forth Pierce's mental limitations and abilities and that the vocational expert's testimony in response to the question constituted evidence sufficient to support the ALJ's finding that Pierce is not disabled.

The judgment is affirmed.

HEANEY, Circuit Judge, dissenting.

---

<u>Good</u> - Ability to function in this area is limited but satisfactory.
<u>Fair</u> - Ability to function in this area is seriously limited, but not precluded.

<u>See</u> Admin. Tr. at 250.

There is little or no evidence in the administrative record to support the ALJ's decision that there is gainful work in the manufacturing sector that Roger Pierce can perform "in the sometimes competitive and stressful conditions in which real people work in the real world." McCoy v. Schweiker, 683 F.2d 1138, 1147 (8th Cir. 1982) (en banc). To the contrary, substantial evidence in the record as a whole leads to only one conclusion: that Pierce is totally disabled within the meaning of the Social Security Act. Accordingly, I respectfully dissent.

Most of the relevant facts are undisputed: Pierce is a 56-year-old male with a seventh-grade education. For several years he successfully operated a 700-acre farm. In 1986 he lost the farm in a foreclosure proceeding. He then worked for a short period of time as a packer in a manufacturing plant.

Beginning in 1980, Pierce was treated for a variety of health problems involving headaches, dizziness, and stomach problems, including duodenal and peptic ulcers and irritable bowels. Between July 1982 and January 31, 1984, Pierce was hospitalized three times for these medical conditions. He was also treated as an outpatient on several occasions from 1980 through 1987 for the same conditions. He finally quit his job as a packer in July 1987, stating that he was unable to continue to work because of the medical conditions for which he had received and continued to receive treatment. On December 11, 1987, he fell off the back of his pickup truck and fractured his right ankle. Four days later the fracture was repaired and a metal plate was installed.

Unfortunately, at least thirty-eight pages of the administrative record relating to Pierce's inpatient and outpatient treatment and medications prescribed are largely unreadable. I have complained about this problem on several occasions in the past and again complain. Unreadable records are of no value to the ALJ, the Commissioner, the district court, or this court. It is the responsibility of the Commissioner to make sure that a complete, readable, medical record is available to

all parties. Nonetheless, I have done the best I can, and this court must decide the case on the basis of the records that can be read. Insofar as they are decipherable, they demonstrate clearly that Pierce has had serious medical conditions since 1980, that he has sought and received treatment for these conditions, that his treating doctors have prescribed medication for the conditions, and that he has taken the medication regularly. Suffice it to say that Pierce worked for several years with the medical conditions, but they finally became so severe that he no longer was able to work.

When this matter was first before an ALJ, he held that notwithstanding the fact that Pierce had dysthymia, he could return to his past relevant work as a farmer. The district court reversed and remanded with directions to the ALJ to consider all of Pierce's credible complaints that affected his ability to perform his past relevant work. On remand, a new ALJ concluded in May 1996 that Pierce could not return to his past relevant work, but held that there were significant numbers of jobs existing in the economy that Pierce could perform consistent with his residual functional capacity, age, education, and work experience, including 20,000 regional manufacturing jobs. The Commissioner approved the ALJ's decision, and the district court affirmed.

On appeal, Pierce contends that the ALJ's decision is not supported by substantial evidence. Pierce argues that his ability to do light or sedentary work in the manufacturing industry is seriously limited by his only <u>fair</u> ability[3] to function independently, maintain attention and concentration, and demonstrate reliability.[4]

---

[3]The ALJ conceded that Pierce had only a <u>fair</u> ability to deal with work stress and included this factor in the hypothetical given to the vocational expert.

[4]Pierce does not challenge on this appeal his:

residual functional capacity to lift and carry up to 25 pounds, occasionally; stand and walk for 4 hours in an eight hour work period, without interruption; and sit for a total of 6 hours within an eight hour

The ALJ who initially heard the matter referred Pierce to Dr. Tom Heisler for a psychological examination. Dr. Heisler diagnosed Pierce as having "dysthymia [and] personality disorder NOS (with dependent and hypochondriacal features)." He reported that Pierce had a "very good" or "good" ability to follow work rules; relate to co-workers; deal with the public; use judgment; interact with supervisors; understand, remember, and carry out complex job instructions; understand, remember and carry out detailed, but not complex, job instructions; understand, remember and carry out simple job instructions; maintain personal appearance; behave in an emotionally stable manner; and relate predictably in social situations. Dr. Heisler reported, however, that Pierce had only a <u>fair</u> ability to deal with work stresses, function independently, maintain attention/concentration, and demonstrate reliability, with <u>fair</u> being defined as the "ability to function in this area is seriously limited, but not precluded." Finally, Dr. Heisler stated that there was no exaggeration or malingering evidenced. The first ALJ noted Dr. Heisler's report in his decision but did not call a vocational expert to determine whether light or sedentary jobs that Pierce could perform existed in the national economy in light of Pierce's only <u>fair</u> abilities in the stated areas.

---

work period, 2 without interruption; and ability to alternately stand and sit. He has an environmental limitation from working from heights.

[H]e can occasionally climb, balance, stoop, crouch, kneel, and crawl. The claimant is also able to reach, handle, feel, push/pull with a slight impairment with no impairment involving his ability to see, hear, and speak.

(Admin. R. at 278.)

The record indicates that Pierce may, in fact, have difficulty in standing, walking, and sitting without interruption for the time periods stated, but the issue is not raised by Pierce and thus will not be considered on appeal.

On remand, the second ALJ called a vocational expert and posed a hypothetical question regarding Pierce's ability to lift, carry, sit, stand, push and pull. Based on this hypothetical, the vocational expert opined that there were jobs in the manufacturing industry, e.g., making microwave ovens, making cosmetics and cosmetic supplies, and assembling and manufacturing personal computers, that Pierce would be able to perform.[5] The ALJ then asked an additional question based on Dr.

---

[5]The vocational expert did not list the occupational titles for the jobs he claimed were available based on this hypothetical. However, it appears from page 166 of volume 1 of the administrative record that he was referring to title numbers 727.684-026 and 727.687-046 in the Dictionary of Occupational Titles. Both of these jobs are in the light category. The first, "plate assembler, small battery," requires a reasoning level of 3, which is defined as:

> Apply commonsense understanding to carry out instructions furnished in written, oral, or diagrammatic form. Deal with problems involving several concrete variables in or from standardized situations.

This job also requires a mathematical development of level 2, defined as:

> Add, subtract, multiply and divide all units of measure. Perform the four operations with like common and decimal fractions. Compute ratio, rate, and percent. Draw and interpret bar graphs. Perform arithmetic operations involving all American monetary units.

And finally requires language development at level 2, defined as:

> Reading:
> Passive vocabulary of 5,000-6,000 words. Read at rate of 190-215 words per minute. Read adventure stores and comic books, looking up unfamiliar words in dictionary for meaning, spelling, and pronunciation. Read instructions for assembling model cars and airplanes.

> Writing:
> Write compound and complex sentences using cursive style,

proper end punctuation, and employing adjectives and adverbs.

Speaking:
Speak clearly and distinctly with appropriate pauses and emphasis, correct pronunciation, variations in word order, using present, perfect, and future tenses.

Id. at 1011.

The second occupation referred to by the vocational expert is a "cell tuber, hand (elec. equip.)." This job requires a reasoning level of 1:

Apply commonsense understanding to carry out simple one- or two-step instructions. Deal with standardized situations with occasional or no variables in or from these situations encountered on the job.

It also requires a mathematical development level of 1:

Add and subtract two digit numbers. Multiply and divide 10's and 100's by 2, 3, 4, 5. Perform the four basic arithmetic operations with coins as part of a dollar. Perform operations with units such as cup, pint, and quart; inch, foot, and yard; and ounce and pound.

Finally, it requires a language development level of 1:

Reading:
Recognize meaning of 2,500 (two- or three-syllable) words. Read at rate of 95-120 words per minute. Compare similarities and differences between words and between series of numbers.

Writing:
Print simple sentences containing subject, verb, and object, and series of numbers, names, and addresses.

Speaking:
Speak simple sentences, using normal word order, and present and past tenses.

Heisler's 1992 report:

> Q  [A]ssume that the hypothetical individual has good ability to follow work rules, has good ability to relate to co-workers, has good ability to deal with the public, good ability to use judgement [sic], good ability to interact with supervisors, and <u>fair ability to deal with work stresses, fair ability to function independently, fair ability to maintain attention and concentration,</u> good ability to understand, remember, and carry out detail, but no complex – correction – has good ability to understand, remember and carry out complex job instructions, has very good ability to understand, remember and carry out details, but not complex instructions.  Has very good ability to understand, remember and carry out simple job instructions, has good ability to maintain personal appearance, has good ability to behave in an emotionally stable manner, he has good ability to relate particularly in social situations, and fair ability to demonstrate reliability.  Would that alter or change – well, would there be any jobs in the regional or national economy, which that individual could perform?

(Admin. R. at 331.)

The vocational expert responded in substance that a "<u>fair</u> ability to deal with work stresses, function independently, maintain attention and concentration, and demonstrate reliability" would preclude the work in the manufacturing industry previously described and that "there would be no jobs in the regional or national economy that person could do."  <u>Id.</u> (emphasis added).

---

<u>Id.</u>

Because no issue is raised by Pierce as to his ability to meet the reasoning, mathematical, and language skills, I assume for the purposes of this dissent that he can meet them, leaving only the issue of his ability to function independently, maintain attention and concentration, and demonstrate reliability.

Based on Dr. Heisler's evaluations and the vocational expert's opinion, the ALJ had no alternative but to award disability benefits to Pierce. He chose, however, to reject Dr. Heisler's opinion that Pierce had only a <u>fair</u> ability to function independently, to maintain attention and concentration, and to demonstrate reliability and to substitute his own opinion that Pierce had a <u>good</u> ability as to each factor. The only support for this decision is found in a single sentence of the ALJ's opinion: "The extensive nature of the claimant's daily activities reflect no deficiencies of concentration, persistence, or pace." (Admin. R. at 273.) The most charitable thing that one can say about the ALJ's conclusion is that it has absolutely no support in the record.

Dr. Heisler was fully aware of Pierce's daily activities. He neither overstated nor understated them. The ALJ was required to give credence to the doctor's findings. The Commissioner cites <u>Bentley v. Shalala</u>, 52 F.3d 784, 786-87 (8th Cir. 1995), for the proposition that an ALJ may reject the conclusion of any medical expert if the conclusions are inconsistent with the medical record as a whole. I have no quarrel with the case or the proposition. The fact is, however, that in <u>Bentley</u> there was conflicting medical testimony. In this case, there is no conflict in medical testimony, thus, no ability of the ALJ to choose between the opinions of doctors. The ALJ simply substituted his opinion for that of Dr. Heisler and other doctors.

It is a total exaggeration to state that Pierce's daily activities are extensive or that they demonstrate an ability to perform light or sedentary work. This court's en banc decision in <u>McCoy</u>, by which we are all bound, makes clear that the test is the ability to perform day in and day out in the sometimes competitive and stressful conditions in which real people work. <u>See</u> 683 F.2d at 1147; <u>see</u> <u>also</u> <u>Baumgarten v. Chater</u>, 75 F.3d 366, 369 (8th Cir. 1996) ("We have repeatedly held . . . that 'the ability to do activities such as light housework and visiting with friends provides little or no support for the finding that a claimant can perform full-time competitive work.' To establish disability, [a claimant] need not prove that her pain precludes all productive

activity and confines her to life in front of the television.") (quoting <u>Hogg v. Shalala</u>, 45 F.3d 276, 278 (8th Cir. 1995) (citations omitted)); <u>Thomas v. Sullivan</u>, 876 F.2d 666, 669, 670 (8th Cir. 1989) ("First, we note that a claimant need not prove she is bedridden or completely helpless to be found disabled. Second, we remind the Secretary that to find a claimant has the residual functional capacity to perform a certain type of work, the claimant must have the ability to perform the requisite acts day in and day out, in the sometimes competitive and stressful conditions in which real people work in the real world.") (citations omitted).

The undisputed evidence is that Pierce arises somewhere between 3:00 a.m. and 7:00 a.m. He takes his medication and then walks around in the yard. He has good days and bad days. He doesn't eat very much and occasionally makes a meal for himself, vacuums, or washes a few dishes. He is home alone from 2:00 to 4:00. His wife or daughter is with him the rest of the time. He gets four to five hours sleep each night and does not feel rested when he arises in the morning. He has difficulty walking and cannot walk very far. On a good day, he can stand on his feet for 20 to 30 minutes. He has trouble with his grip. He can take care of his personal needs. He has chest pain. He has consistent headaches that last from three to four weeks, and he takes medication for his headaches nearly everyday. When he has a headache, he sits around or lays down. He can maintain attention and concentration only when he does not have headaches. He has trouble breathing. He is frequently nauseated. He experiences frequent dizzy spells generally lasting ten to fifteen minutes. He has passed out on three occasions while having these dizzy spells, once when he was operating his riding lawnmower which he uses to mow his one-acre lawn once a week. This takes him all day. He sees his family doctor frequently. He does not go to church or visit people. To entertain himself he walks around the yard or sits around. He takes all his prescribed medication on a regular basis.[6] If he were told to

---

[6]Propulsid, used to treat stomach problems such as ulcers and poor digestion; Pepcid, inhibits acid production in stomach; Zestoretic, used to treat high blood

be someplace at a certain time, he would be there if he were not sick. Pierce has a driver's license but stated in the first hearing that due to his dizzy spells, he did not drive unless his wife or daughter were unable to and only when necessary. At the second hearing he again stated that he did not drive much any more.

This testimony is totally consistent with his medical history and with the medication he takes. The ALJ made no finding that his testimony was not credible. Given this extensive list of problems, it is inconceivable that Pierce could work each day "in the sometimes competitive and stressful conditions in which people work in the real world." McCoy, 683 F.2d at 1147.

Counsel for the Commissioner cites five reasons, other than the one advanced by the ALJ, for affirming the ALJ's decision. (Appellee's Br. at 15-17.) None of the reasons were cited by the ALJ to support his decision and none were given by the Appeals Council when it approved the ALJ's decision. Thus, I believe it is improper for the Commissioner to advance them now for the first time as support for the ALJ's decision. The ALJ may or may not have believed that the reasons had merit. We can only assume the latter, as he chose to base his decision solely on the question of whether Pierce's ability to function independently, to maintain attention and concentration, or to demonstrate reliability was fair or good.

One of the reasons advanced by the Commissioner was that Pierce failed to follow up with psychotherapy treatment. Not only was this issue not raised by the ALJ, but it is one that is hotly disputed in the record, there being a good deal of evidence that Pierce did follow through with Dr. Heisler's recommendation and that at no time has he refused treatment. I would further note that if Pierce's treating physicians recommend that he receive psychotherapy treatment and he fails to comply with their recommendation, then the Commissioner may seek termination of benefits.

---

pressure; Midrin, used to treat headaches/migraines; Amitriptyline, used for depression, pain and to help sleep; and Xanax, used for anxiety.

-14-

There is only one issue in this case, namely, whether there is substantial evidence in the record as a whole to support the ALJ's decision that Roger Pierce had a <u>good</u> rather than a <u>fair</u> ability to function independently, to maintain attention and concentration, and to demonstrate reliability. The answer must be no. Dr. Heisler, a government consultant, indicated that Pierce's ability was only <u>fair</u> and that opinion is consistently supported by Pierce's extensive medical history, his limited activities, and his testimony, which is fully supported by the objective facts. The ALJ has not shown any valid reason to reject Dr. Heisler's opinion. If the ALJ had good reason to question that opinion, then he could have addressed additional questions to the doctor or called him as a witness. Instead, he substituted his judgment for that of the doctor without reason. The Commissioner does not question the vocational expert's testimony that if Pierce's abilities in the questioned areas were only <u>fair</u>, then there were no jobs in the regional or national economy that Piece could hold.

Pierce filed for disability in May 1991, and there is no basis other than that found by the ALJ to deny Pierce disability benefits from that date to the present. Thus, Pierce should be awarded disability benefits from May 1991 to the present, and I would remand to the district court with directions to it to remand to the Commissioner with instructions to award benefits accordingly.

A true copy.

Attest.

CLERK, U.S. COURT OF APPEALS, EIGHTH CIRCUIT.